UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RUSSELL MONTGOMERY,

                    Petitioner.

                                                    **DECISION AND ORDER**
          -vs-                                      **No. 04-CV-6474(VEB)**

ROBERT WOOD, Superintendent,
Upstate Correctional Facility,

                    Respondent.
_____

## I.    Introduction

*Pro se* petitioner Russell Montgomery ("Montgomery" or "Petitioner") has filed a

petition for a writ of habeas corpus under 28 U.S.C. § 2254. Montgomery challenges the

constitutionality of his state-custody pursuant to a judgment of conviction entered in Erie County

Court, after a jury found him guilty of Murder in the Second Degree (N.Y. Penal Law §

125.25(1)) and Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law §

265.03(2)). Montgomery is currently serving concurrent indeterminate sentences of 22 years to

life for the murder conviction and 6 to12 years for the weapons-possession count

        The parties have consented to disposition of this matter by a magistrate judge pursuant to

28 U.S.C. § 636(c)(1).

## II.    Factual Background and Procedural History

        On April 16, 1998, at about 2:00 p.m., Paul Pope ("Pope" or "the victim") visited

Wymiko Anderson, also known as "Pumpkin," at her house.  T.282-83.[1] Pumpkin was the

_____

[1]         Citations to "T.__" refer to the transcript of Petitioner's trial.

mother of a child by Pope.  Before he left, Pope gave Pumpkin some money and told her that he would give her more money later that day after he completed a large drug sale with petitioner. T.284.

At around 6 p.m. that evening, Tashawn Davis ("Tashawn"), who also had a child fathered by Pope, went over to Pope's house. T.47-48, 49. The two then drove over to petitioner's house in Pope's White Pontiac Grand Am. T.48-50, 62-63. Pope brought with him a large amount of crack cocaine and cash. T52-53, 163-164. After parking the Grand Am in the driveway on the side of Petitioner's house at 488 Dartmouth, Pope went inside and Davis waited in the car and listened to loud music. T.50-51. According to Tashawn, loud music also was blaring from Petitioner's house. T.51. Petitioner was home alone; the mother of his child, Constance Ferguson ("Ferguson"), with whom he shared the house on Dartmouth, was away on a trip to Missouri. T.114.

About ten minutes later, Pope and Petitioner came out onto the front porch. Tashawn said that Petitioner tried to see who was waiting in Pope's car before he and Pope re-entered the house. T.50-52.

Soon thereafter, Pope came back to the car, retrieved something from his coat pocket and went back into the house. T.50, 61. About 10 to 15 minutes later, Petitioner came out of the house alone. After placing a white plastic bag in the garbage can, Petitioner approached the car where Tashawn was waiting for Pope. Petitioner told her that Pope had instructed him to drive her, in Pope's white Grand Am, to go purchase some marijuana. T. 50-51, 53, 56. Davis thought this was strange for a number of reasons. First, she did not smoke marijuana. Second, no one (other than Pumpkin) ever drove Pope's Grand Am. Third, it was unusual for Pope not to come

out of the house himself to tell her what to do. T.53-55; 283, 298.

Despite her misgivings, Tashawn went along with what Petitioner's plan. Before they left, however, Petitioner went back into his house. When he returned, he had a dark colored hat. Petitioner then drove them both away in the Grand Am.

Within a few minutes, Tashawn recalled, Petitioner received a page, which he claimed was from Pope. T.56. Petitioner proceeded to drive to a house on Delavan to answer the page. T.56. When Petitioner returned to the car, he told Tashawn that Pope had instructed him to give her $20.00 and drive her home. Petitioner explained that Pope's "man," "Pumpkin," had called and wanted him to do something. T.57. Tashawn immediately knew something was wrong because she knew "Pumpkin" was a woman, not a man. T.57-58, 66. Tashawn then asked Petitioner to stop at Kentucky Fried Chicken before he dropped her off but Petitioner refused, claiming that Pope had directed him to "hurry back." T.58. After allowing Tashawn to quickly run into a corner store for some candy, he drove her home. T.58. Before Petitioner could drive away from Tashawn's house, he was flagged down by another car occupied by Pope's cousin, Dion Anderson ("Anderson"), and Melvin Calhoun ("Calhoun"). T.59, 129.

Anderson, who was supposed to meet Pope at Tashawn's house at about 6:45 p.m. to borrow money from him, had driven around the block a few times before noticing Petitioner driving Pope's car at about 7:00 p.m. T.127-128, 148-151. Anderson and Calhoun testified that they thought it was odd for Petitioner to be driving Pope's car because they knew that Pope never let anyone except Pumpkin drive the Grand Am. T.130-131, 153, 283, 298.

When Anderson and Calhoun asked Petitioner where Pope was, Petitioner responded that he did not know. He mentioned, however, that he knew Pope was "taking care of some

business." Petitioner then rolled up his window and "peeled off". T.129, 151. This was about 7:00 p.m.

Anderson, Calhoun, and Tashawn then went into Tashawn's house to try to contact Pope by phone. Tashawn explained that she knew Pope had had his pager and cell phone with him when he had gone into Petitioner's house on Dartmouth. T.55-56, 131, 151-52. Tashawn paged Pope using their emergency code, "911." T.55, 59-60, 73). Pope did not return any of her pages, which Tashawn found to be strange since Pope always called her back right away. Nor did Pope return Anderson or Calhoun's pages either, which also was not like him. T.55, 152-53. By that time, Tashawn, Anderson and Calhoun all felt that "something was not right." T.131-32.

At 7:15 p.m., about fifteen minutes after Petitioner had sped away from Tashawn's house, a man named Louis Faulkner ("Faulkner") was driving down Kay Street and noticed an African-American male, about 25 to 30 years old, with a dark colored hat driving a vehicle identified as Pope's white Pontiac Grand Am. Faulkner watched the man park the Grand Am, which by now had a shattered rear window, in a driveway on Kay Street. T.176-80.

Later that night, at about 10:00 p.m., Pope's friend, Khalid Wiley ("Wiley"), went to Petitioner's house on Dartmouth after Pumpkin told him that she suspected Petitioner had done something to Pope. When Wiley knocked on Petitioner's door, nobody answered. T.186-87, 189-91.

At about 11:50 p.m., police officers responded to a call regarding a white Pontiac Grand Am with a broken window parked on Kay Street. T.235, 244-45, 258-59. When the officers arrived, they noticed blood on the right side of the rear window and on the trunk area. T.235, 238. They then searched the car and found the keys in the ignition. T.235, 245. One officer

opened the trunk with the keys and found Pope's dead body "jammed" inside and the trunk's

interior covered with blood.  T.236, 238-39, 245-46, 248-49, 259.

That night, someone called Davis and informed her that Pope had been found dead in the

trunk of his Grand Am on Kay Street. T.61.[2]

The following morning, at about 9:00 a.m., Wiley went back to Petitioner's house on

Dartmouth. T.183-84, 186. Upon his arrival, Wiley saw Petitioner and Jimmy Newkirk

("Newkirk") getting out of a car, carrying a mop and cleaning supplies. T.184. Wiley approached

the driveway, where Petitioner was examining a broken basement window. Petitioner asked

Wiley if the window had been broken the night before. T.185. Wiley thought Petitioner's

question was odd since no one had answered the door when he had stopped by the night before.

T.186.

Petitioner and Wiley walked to the front of the house and Petitioner invited Wiley inside

to smoke a "blunt." T.185. Wiley related that Petitioner went around to the back of his house and

then came out of the front door with large item in his front pocket; this object appeared to Wiley

to be a gun. T. 187. Thinking that the whole situation was "strange,"Wiley made up an excuse

and took off. T.185-86.

At about 8:00 or 9:00 p.m. that evening, Ferguson returned from her trip. T.115. No one

was home when she entered the house she shared with Petitioner on Dartmouth Street.

Petitioner's keys were lying on the kitchen table. T.115-16. When Ferguson saw that a basement

---

[2]     Detective Henry Smardz testified that the location on Kay Street where Pope's Grand Am
containing his dead body was found, was located about one and a half blocks from 488 Dartmouth (Petitioner's
home address). T.76. Detective Raniero Masecchia testified that the distance between Grape Street (on which
Tashawn's house was located) and 488 Dartmouth was 6.5 miles, and that it took him eight and one-half minutes to
travel between the two points. T.306-07.

window was broken, she called the police, thinking there had been a burglary. T.118.

When the officers arrived, Ferguson gave them written permission to search the house. T.252-56, 262-63. Although officers found no evidence of that they house had been broken into, they discovered what was later determined to be Pope's blood dripping through the upstairs bathroom floor to the basement, onto the washing machine and the basement floor nearby. T.253, 263-66, 314, 395-401. The trail of blood continued to the stairs leading to the basement and in the hallway. T.399-405. On the main floor, traces of Pope's blood were found in the kitchen around the stove and in small clump-like spots on the kitchen floor. T.272. In addition, Pope's blood was on the wall tiles in the bathroom and on the bathtub. T.253, 274-75. The police discovered a mop standing next to the kitchen stove; a bottle of bleach with blood on its handle was found on the bathroom vanity. T.275. Additionally, a bottle of Pine Sol-brand cleaner was found on the dining room table along with the receipt for the mop and cleaning supplies. T.273. Outside in the garage, the police located a pail with blood stains on it underneath Petitioner' car. T.268-69. The exterior wall of the house near the driveway displayed traces of Pope's blood, as did the side door and a block glass window. T.269. Finally, the police discovered a blood-stained gray shirt in a garbage can on the side of the house. T.270-71. Ferguson told the police that she had no idea how the interior and exterior of her house had come to be covered in blood. She explained that it was not there before she left for her trip. T.315.

Ferguson also testified that she, Petitioner, and her mother were the only people who had the keys to the house on Dartmouth. T.112-13.

The medical examiner determined that Pope died from two gun shot wounds; one was a close-range shot to his head and the other was to his abdomen. T.364, 366-68, 371, 376-77. Pope

had also sustained multiple other injuries and abrasions related to the gun shot wounds. T.364-65, 372-73.

The defense theory focused upon analyzing the chronology of events provided by the prosecution's witnesses in order to try to show that Petitioner could not have been with Pope at the time of his death. Petitioner attempted to estimated the time of Pope's death through the onset of rigor mortis. On cross-examination, the medical examiner stated that Pope's time of death could not be clearly determined and that such an estimation would be either impossible or, at best, a "gamble". T.384. The medical examiner explained that the difficulty in ascertaining the time of death was partially due to Pope's body having been placed in the cooler in the morgue when it was brought in; this would have decelerated the rigor mortis process. T.386. According to the medical examiner, it could not be determined whether rigor mortis was setting in or passing off Pope's body. T.386-87.

Petitioner testified in his own behalf at trial, explaining that Pope had come over to his house on April 16, 1998, at about 6:00 p.m. to engage in a drug transaction with a third person, an unidentified male. T.433-36. Petitioner offered to go buy marijuana for Pope and the third party to use, and Tashawn Davis agreed to go with him on this errand. T.436-37. Petitioner also claimed to have driven Pope's Grand Am on two or three previous occasions. T. 437-38.

Petitioner testified while he was out buying marijuana, Pope paged him. When he returned the page, he was instructed by Pope instructed to give Tashawn $20 and take her home because Pope had to do something with Pumpkin. T.439-40. Petitioner admitted that when he dropped Tashawn off at her house, he spoke with Anderson and Calhoun but lied to them about not knowing where Pope was. T.440-42.

-7-

Petitioner testified that he returned home to Dartmouth Street and engaged in a drug sale with Pope and another male. Petitioner explained that the customer bought cocaine and left, and then Petitioner handed the money over to Pope. Pope departed Petitioner's house at about 7:45 p.m. T.443-46. About a half-hour later, Petitioner said, he took a cab to meet his girlfriend, Tameka Jones ("Jones"). The records of the cab service called by Petitioner indicated there was a call for a pick-up at Petitioner's address at 8:17 p.m. that evening. Petitioner explained that he spent the rest of the evening with Jones, visiting friends and family members. He then stayed overnight at her house on West Avenue. T.447-53.

Jones testified for the defense that Petitioner had come over to her house at about 8 p.m. on the night of the incident. They visited a few places together and then Petitioner spent the night at her place. T.201-03.

Shawn Lewis ("Lewis") testified for the defense that Petitioner, accompanied by Jones, visited Lewis' sister's house on Wecker Street at about 8:30 p.m. on the night of April 16, 1998. T.450.52.

The next morning (April 17, 1998), Petitioner testified, he learned of Pope's death. Petitioner maintained, however, that he had nothing to do with it. T.453, 462. Petitioner admitted that he bought cleaning supplies and mopped parts of the house, but he did so only because he just wanted to clean up the place a little before Ferguson returned home from her trip. T.455-57, 477-78, 484-85. Although Petitioner was at the house on the morning of April 17, 1998 (the day that Ferguson returned home and called the police after suspecting a break-in), he claimed that he did not see blood anywhere. T.460-61, 486-88.

Following his conviction on both counts in the indictment, Petitioner timely appealed to

the Appellate Division, Fourth Department. Petitioner's conviction was unanimously affirmed on March 21, 2003. *People v. Montgomery*, 303 A.D.2d 978 (App. Div. 4th Dept. 2003). Permission to appeal was denied on August 13, 2003. *People v. Montgomery*, 100 N.Y.2d 597 (N.Y. 2003). By motion dated February 11, 2004, Petitioner sought to vacate his conviction pursuant to New York Criminal Procedure Law ("C.P.L.") §440.10. Petitioner claimed, in part, that his trial attorney did not afford him effective representation by not investigating the crime scene or hiring an investigator, not consulting with him and not taking an interest in the case, and not raising a claim that his arrest was unlawful. The trial court denied petitioner's motion in a memorandum and order granted June 4, 2004, on the basis that the motion did not contain sufficient factual allegations supporting his claims, *see* N.Y. CRIM. PROC. LAW §440.30(4)(b). Permission to appeal to the intermediate appellate court was denied on August 24, 2004.

After Montgomery filed in the instant petition, respondent answered and asserted that . On February 2, 2005, this Court granted Petitioner's motion for a stay to allow him to return to the state court to exhaust his remedies regarding certain unexhausted claims. Petitioner instituted a second C.P.L. § 440.10 motion, which was denied by the trial court. Leave to appeal was denied by the Appellate Division. Petitioner timely returned to this Court and requested that the stay be lifted and that the Court reinstate all of his claims. Respondent then filed opposition papers addressing the merits of Petitioner's newly exhausted claims. Petitioner filed responsive papers.

For the reasons that follow, Petitioner's request for a writ of habeas corpus is denied and the Petition is dismissed.

## III. Discussion

### A.   General legal principles applicable on habeas review

When a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also*, *e.g.*, *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir.2008). Under § 2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.' " Id. (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413; *accord*, *e.g.*, *Bierenbaum v. Graham*, 607 F.3d 36, 47 (2d Cir. 2010). A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir.2009).

### B.   "Adequate and independent state ground" doctrine and procedural default

A procedural default generally bars a federal court from reviewing the merits of a habeas claim. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). Thus, federal habeas review is prohibited if a state court rests its judgment on a state law ground that is "independent of the federal

question and adequate to support the judgment." *Cotto v. Herbert*, 331 F.3d 217, 238 (2d Cir.2003) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). A state procedural bar qualifies as an "independent and adequate" state law ground if "the last state court rendering a judgment in the case clearly and expressly stated that its judgment rest[ed] on a state procedural bar." *Levine v. Commissioner of Corr. Servs.*, 44 F.3d 121, 125 (2d Cir.1995) (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)). The Second Circuit has made clear that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990). Thus, "federal habeas review is precluded 'as long as the state court explicitly invoke[d] a state procedural bar rule as a separate basis for decision.'" *Id.* (quoting *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989)). A state procedural bar will generally be adequate to preclude habeas review if it is "firmly established and regularly followed." *Lee v. Kenna*, 534 U.S. 362, 376 (2002) (quotation omitted)).

A habeas petitioner can overcome a procedural bar if he can show both "'cause' for noncompliance with the state rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Smith v. Murray*, 477 U.S. 527, 533 (1986) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977); *Murray v. Carrier*, 477 U.S. 478, 485 (1986)); *accord, e.g.*, *Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir. 2001). The Supreme Court has found no "actual prejudice" where, for example, the petitioner shows "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456

U.S. 152, 170 (1982). A habeas petitioner establishes "cause" if he can show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. at 496. An example of cause for default is a "showing that the factual or legal basis for a claim was not reasonably available" at the time preservation was required. *Id.*; *see also Reed v. Ross*, 468 U.S. 1, 15-16 (1984) ("Counsel's failure to raise a claim for which there was no reasonable basis in existing law does not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar."); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994). An alternative manner of overcoming a procedural default is for petitioner to show "failure to consider [the claim] . . . will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750. However, this exception is limited to the extraordinary case where a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

## C.    Analysis of claims raised in the Petition

### 1.    Denial of Petitioner's motion for a trial order of dismissal based upon insufficiency of the evidence

Petitioner argues that the trial court erred in denying his motion, made at the close of the prosecution's case, for a trial order of dismissal. Respondent argues that Montgomery's claim of insufficiency of the evidence is procedurally defaulted as a result of the state appellate court's reliance upon an adequate and independent state ground to dismiss it. As respondent points out, the Appellate Division found that Petitioner waived this claim by not renewing his motion after the defense presented evidence. *See People v. Hines*, 97 N.Y.2d 56, 61 (N.Y.), *rearg. denied*, 97 N.Y.2d 678 (N.Y. 2001). *Hines* held that once a defendant presents evidence on a charge at his

trial, he subsequently waives any argument going to the sufficiency of the evidence for purposes of appellate review. In other words, a defendant's introduction of proof in his behalf at trial renders futile an earlier-made motion for dismissal based on insufficiency of the prosecution's evidence. *See People v. Kirkpatrick*, 32 N.Y.2d 17, 21 (N.Y. 1973) ("However, it is settled that a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, proceeds with the risk that he will inadvertently supply a deficiency in the People's case.") (citing, *inter alia*, *United States v. Calderon*, 348 U.S. 160, 164 n. 1 (1984) ("By introducing evidence, the defendant waives his objections to the denial of his motion to acquit."); *accord People v. Hines*, 97 N.Y.2d at 61. Thus, the New York Court of Appeals explained in *Hines*, "an insufficiency argument may not be addressed unless it has been properly preserved for review during the trial. And we have held that 'a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, proceeds with the risk that he will inadvertently supply a deficiency in the People's case[.]' Thus, a defendant who presents evidence after a court has declined to grant a trial motion to dismiss made at the close of the People's case waives subsequent review of that determination." 97 N.Y.2d at 61 (quotation and citations omitted).

This is what occurred in here. Montgomery testified in his own behalf and presented a defense witness. Because Montgomery presented a defense, it appears that under New York law, the motion for a trial order of dismissal made by trial counsel prior to the defense case was nullified by the presentation of evidence on Montgomery's behalf. As there was no additional motion for a trial order of dismissal after the defense rested, any claim Montgomery had regarding the legal insufficiency of the evidence was not properly preserved for appellate review.

-13-

The rule relied upon by the Appellate Division was "firmly established and regularly followed state practice," *see, e.g., People v. Lane*, 7 N.Y.2d 888, 889 (N.Y.2006), sufficient to satisfy the "adequate" prong of the "adequate and independent" test. In determining adequacy of a state procedural bar, the Second Circuit has looked at (1) whether the alleged procedural violation was actually relied on in the state court, and whether perfect compliance with the state rule would have changed the state court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto v. Herbert*, 331 F.3d at 240 (citing *Lee*, 534 U.S. at 386-87).

Here, the rule was "actually relied upon" by the state courts. As for the second factor, "state caselaw indicate[s] that compliance with the rule was demanded in the specific circumstances presented," *Cotto*, 331 F.3d at 240, for it is well established as a matter of New York law that a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, "proceeds with the risk that he will inadvertently supply a deficiency in the People's case," and waives subsequent review of that determination. *People v. Hines*, 97 N.Y.2d at 61 (citing, *inter alia, People v. Kirkpatrick*, 32 N.Y.2d at 21). The "rationale underlying this rule is that a reviewing court should not disturb a guilty verdict by reversing a judgment based on insufficient evidence without taking into account all of the evidence the jury considered in reaching that verdict, including proof adduced by the defense." *Id.* This specific preservation rule requiring renewal of a motion appears analogous to case law holding that a general motion to dismiss fails to preserve a specific claim of insufficiency as to a specific count.

*See*, *e.g.*, *People v. Lane*, 7 N.Y.3d at 889.

As to the third *Cotto* consideration, it is clear that Montgomery did not make an effort to "substantially" comply with this rule, for he failed to renew his motion to dismiss at the close of all the evidence. *Cotto,* 331 F.3d at 240. Although trial counsel made a motion to dismiss after the close of the prosecution's direct case, trial counsel failed to renew his motion after the close of all the evidence.

Consideration of the relevant factors weighs in favor of finding that the procedural bar rule, as applied by the state courts in Montgomery's case, was "adequate" to preclude federal habeas review. *Cf. Evans v. Sewkowski*, No. 03-CV-416S, 2006 U.S. Dist. LEXIS 69026, at *15-16 (W.D.N.Y. Sept. 26, 2006) (Skretny, D.J.) (finding the invocation of the state procedural bar rule to be adequate even where petitioner's trial counsel made a general motion to dismiss at the end of the prosecution's case, and, after the defense rested, "simply sought to 'renew the motions [he] made earlier"; trial counsel failed to argue any specific rationale in support of either application).

On the instant record, Montgomery is unable to establish cause for the default or prejudice attributable thereto. Ineffective assistance of counsel can constitute "cause" but only if it amounts to truly deficient representation as measured by Federal constitutional standards, and if the claim of ineffective assistance has been separately exhausted in the state courts. Here, Montgomery cannot use trial counsel's failure to renew the motion for a trial order of dismissal as "cause" to excuse the procedural default since he cannot demonstrate the necessary element of prejudice flowing from counsel's omission: As the C.P.L. § 440.10 court found, the Appellate Division considered the "insufficiency of the evidence" claim on the merits notwithstanding the

lack of preservation and concluded that there was legally sufficient evidence to support the jury's guilty verdict.

Furthermore, Montgomery has not come forward with new evidence tending to demonstrate that he is factually innocent, and so cannot fulfill the requirements of the "fundamental miscarriage of justice" exception. Accordingly, the "insufficiency of the evidence" claim is dismissed on the basis that it is subject to an unexcused procedural default.

### 2. Denial of the claim that the verdict was against the weight of the credible evidence

Montgomery claimed on direct appeal that the verdict was against the weight of the credible evidence; the Appellate Division summarily disagreed. This claim derives from C.P.L. § 470.15(5), under which an appellate court in New York is authorized to reverse or modify a conviction if it determines that the "verdict . . . was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5). As the New York Court of Appeals has explained, a "weight of the evidence" argument presents only a state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987). Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire,* 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Federal courts have consistently dismissed claims attacking a verdict as against the weight of the evidence on the basis that they do not present a cognizable federal constitutional

issue amenable to habeas review. *E.g.*, *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996) (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal" and stating that it must defer to the jury's assessments of both of these issues); *Ex parte Craig*, 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255, 44 S.Ct. 103, 68 L.Ed. 293 (1923); *Garrett v. Perlman*, 438 F.Supp.2d 467, 470 (S.D.N.Y.2006) (same); *Rodriguez v. O'Keefe*, 96 Civ.2094, 1996 WL 428164, at *4 (S.D.N.Y. July 31, 1996) ("A claim that the verdict was against the weight of the evidence is not cognizable on habeas review."), *aff'd*, No. 96-2699, 122 F.3d 1057 (table) (2d Cir. Sept.9, 1997), *cert. denied*, 522 U.S. 1123 (1998). Because Montgomery's claim that his verdict was against the weight of the evidence is purely a state law claim that does not present a federal constitutional issue cognizable on habeas review, it must be dismissed.

3.     **Denial of Petitioner's Sixth Amendment right to the effective assistance of trial counsel**

a.     **Overview**

In his two C.P.L. § 440.10 motions, Montgomery asserted a number of alleged errors on the part of trial counsel. Since Montgomery is proceeding *pro se*, the Court has liberally construed his Petition to be repeating and re-alleging those claims. Respondent likewise has treated the Petition as raising the ineffective assistance claims asserted in Montgomery's motions for vacatur.

Montgomery asserted that counsel erred by failing to retain a private investigator; failing to investigate the crime scene; failing to request a *Dunaway* hearing to ascertain whether there was probable cause for his arrest; and failing to adequately consult with him. These claims were

raised in Montgomery's first C.P.L. § 440.10 motion, and the trial court denied them because they were not supported by sufficient facts, citing C.P.L. § 440.30(4)(b).

In the second C.P.L. § 440.10 motion, Montgomery asserted that trial counsel erroneously failed to adduce evidence that a hair found in the hand of the victim was that of a Caucasian individual. Montgomery claimed that trial counsel should have had DNA testing on the hair which supposedly would have established that he was not the last person to have seen the victim alive. Montgomery also claimed that trial counsel should have retained a DNA expert to dispute the prosecution's theory of the case and explain the lack of direct evidence connecting him to the crime. The second aspect of counsel's performance that Montgomery challenged was counsel's failure to investigate what Willie Bell Thomas ("Thomas") a potential witness, saw at the crime scene. Finally, Montgomery claimed that trial counsel failed to challenge the credibility of prosecution witness Tashawn Davis on the basis that she received consideration from the prosecutor's office in exchange for her testimony against him. The C.P.L. § 440.10 court also found these claims unsubstantiated and without merit.

### b. The *Strickland* standard

In order to obtain habeas corpus relief on the ground of ineffective assistance of trial counsel, petitioner must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v Washington*, 466 U.S. 668, 687 (1984). The court in *Strickland'* noted that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The deficient performance prong requires showing that counsel made errors so serious that counsel was not functioning as the

"counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.466 U.S. at 686-67. The Supreme Court explained that when in reviewing an ineffective assistance of counsel claim, "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. Even if counsel's error was professionally unreasonable, a defendant must still show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. In other words, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 694, 695. The reviewing court, in conducting the prejudice inquiry under *Strickland*, must consider the totality of the evidence before the judge or jury. "[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### c. The alleged errors by trial counsel

#### 1.) Failure to conduct an adequate investigation pre-trial

Montgomery asserts generally that counsel erred by failing to retain a private investigator and failing to personally investigate the crime scene or have an investigator do so. As repeatedly stated by the Second Circuit, the habeas court "will not second-guess trial strategy simply because the chosen strategy has failed," *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir.

1987), especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial. *See United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 958 (1987); *see also Minor v. Henderson*, 754 F. Supp. 1010, 1018 (S.D.N.Y. 1991).

There a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A habeas petitioner's conclusory and unsubstantiated allegations are not sufficient to overcome the strong presumption of reasonableness accorded to counsel's strategic choices. *Jones v. Hollins*, 884 F. Supp 758, 766 (W.D.N.Y. 1995), *aff'd*, 89 F3d 826 (2d Cir. 1995); *Matura v. United States*, 875 F. Supp 235, 237-38 (S.D.N.Y. 1995); *Boyd v. Hawk*, 965 F. Supp. 443 (S.D.N.Y. 1997). Here, Petitioner has offered nothing but his own opinion that counsel should have done things differently; he has not specified what leads defense counsel should have followed up on, for instance, or come forward with anything more than mere speculation that there was exculpatory or other favorable evidence that could have been discovered. *Cf. Greiner*, 417 F.3d at 322 (noting that " [i]n nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel"). Montgomery thus has not demonstrated how he was prejudiced by counsel's alleged failure to investigate the crime scene or to retain a private investigator. *See Atkinson v. United States*, No. 05-CV-286, 2005 WL 3555946, at *7 (N.D.N.Y. Dec. 28, 2005) ("A petitioner's 'bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably.'") (quotation omitted) (quoted in *Ward v. Kuhlman*, No. 9:01-CV-1054 (NPM), 2007 WL 2907353, at *7 (N.D.N.Y. Oct. 4, 2007) (denying habeas relief on petitioner's

unsubstantiated claim that trial counsel failed to conduct a sufficient pre-trial investigation).

Counsel's decision whether to call any witnesses on behalf of the defendant, and if so, which witnesses to call, "is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d at 1321; *see also*, *e.g.*, *United States v. DeJesus*, No. 01-1479, 57 Fed. Appx. 474, 478, 2003 WL 193736, at *3 (2d Cir. Jan. 28, 2003) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999). Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed.")).

Trial counsel, however, did question one of the police officers about an interview with Thomas at the time of the incident. *See* T.338-39. Apparently, Thomas, who resided on Kay Street, saw a white car with three individuals in it pull up and park in the area where Pope's white Pontiac Grand Am was later found and inspected by the police. Thomas observed this at around 10:30 p.m. According to Thomas, a second white car then pulled up, and the three individuals got into that car and left. Petitioner suggested that Thomas' observation was consistent with his innocence since it allegedly showed that Faulkner's recollection was faulty. As noted above, Faulkner testified that Petitioner dropped off the Grand Am–with Pope's dead body in the trunk–at 7:15 p.m. on Kay Street. *See* Petitioner's Appellate Brief on Direct Appeal at 11-12. Petitioner made use of Thomas' information, gleaned through cross-examination of the police officer, which was helpful to a limited extent to the defense. However, as the C.P.L. § 440.10 court and respondent observed, Montgomery has not supplied a statement or affidavit

from Thomas. Thus, his claim that Thomas had favorable or helpful information to provide is entirely speculative. And, accordingly, Montgomery cannot show how he was prejudiced by trial counsel's failure to conduct any additional interviewing of Thomas, *See*, *e.g*., *Bobby v. Van Hook*, __ U.S.__, __, 130 S.Ct. 13, 19 (2009) (*per curiam*) (counsel's failure to interview potential witnesses did not prejudice petitioner because proposed testimony would not have added anything of value to defense); *see also Lou v. Mantello*, No. 98-CV-5542 (JG), 2001 WL 1152817, at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.'") (quoting *Ruzas v. Sullivan*, No. 85 CIV. 4801 (CBM), 1988 WL 83377, at *14 (S.D.N.Y. Aug. 2, 1988) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).

### 2.)    Failure to move for a *Mapp/Dunaway* hearing

Montgomery argues that trial counsel was in effective in failing to request a "*Mapp/Dunaway*" hearing. *See Mapp v. Ohio*, 367 U.S. 643 (1961); *Dunaway v. New York*, 442 U.S. 200 (1979). The distinction between these types of hearings lies in the nature of the evidence being called into question by the defendant. *Dunaway v. New York* addressed the "legality of custodial questioning on less than probable cause for a full-fledged arrest." 442 U.S. at 202 (citation omitted), and thus, a *Dunaway* hearing is used to determine whether a statement or other intangible evidence obtained from a person arrested without probable cause should be suppressed at a subsequent trial. 2009 WL 233981, *7 (S.D.N.Y.) (citing *Edwards v. Mazzuca*, No. 00 Civ. 2290, 2007 U.S. Dist. LEXIS 18542, at *29 n. 9 (S.D.N.Y. Oct. 15, 2007)). A *Mapp* hearing is called for when the defendant alleges that physical evidence sought to be used against

him or her was obtained illegally by law enforcement officers and is inadmissible at trial. *Id.* (citing *Edwards*, at \*7 n. 4). *See also Kirk v. Burge*, 646 F. Supp.2d 534, 540 n.2 (S.D.N.Y. 2009).

Apart from his own opinion that his arrest was without probable cause and counsel *should* have moved for a *Mapp*/*Dunaway* hearing, Petitioner has not suggested that there were any potentially meritorious bases on which such a suppression motion could have been premised. Thus, Petitioner has failed to show how he was prejudiced by counsel's decision in this regard.

### 3.) Failure to meaningfully consult with petitioner and advise him regarding his testimony at trial

Petitioner contends that trial counsel failed to consult sufficiently with him prior to trial. Claims such as this, based solely upon a habeas petitioner's own assessment of how much time his attorney should have spent meeting with him, do not warrant habeas relief. *See Akosa v. United States*, 219 F. Supp.2d 311, 316 (E.D.N.Y. 2002) ("Akosa next argues that trial counsel failed to spend sufficient time with him in order to adequately prepare for trial. His counsel, however, contradicts that assertion, and avers that he 'afforded Mr. Akosa as much consultation as was necessary to prepare an adequate defense for him.' Furthermore, Akosa nowhere specifies how counsel was allegedly 'unprepared,' and the record in this case belies such an assertion. In addition, in light of the overwhelming evidence of his guilt, Akosa cannot show any prejudice resulting from the purported lack of preparedness. Akosa therefore has failed to sustain his burden of proving that either prong of *Strickland* has been satisfied vis-a-vis this claim.") (internal citation omitted); *United States ex rel. Berkowitz v. Deegan*, 323 F. Supp. 951, 953 (S.D.N.Y. 1970) ("The claim now advanced of lack of adequate preparation and the alleged incompetence of counsel is specious. The fact that experienced counsel did not spend hours upon

hours in conferences with petitioner is no indication of lack of preparation. The amount of time required to prepare a case for trial varies with its nature, depending upon the complexity or simplicity of the issues.").

Montgomery also asserts that trial counsel failed to discuss with him the advisability of testifying. He faults counsel for making what he characterizes as a "last minute decision" to call him to the witness stand without adequate instructions or preparations. As the C.P.L. § 440.10 court found, although Petitioner "suggest[ed] that he did not expect to testify, it is not unusual that the decision is not made in advance of trial, but depends on the nature and strength of the prosecution's case." C.P.L. § 440.10 Order dated June 4, 2004, at p. 3. "In that context," the C.P.L. § 440.10 court noted, Petitioner's motion was "devoid of factual allegations showing that counsel lacked a reasonable strategic basis for calling him to the stand." *Id.* Furthermore, the court observed, Petitioner's allegation that trial counsel "failed to prepare him for this eventuality" was "also in the form of a bare assertion, unsupported by any other evidence." *Id.* As the state court found, this claim, like Petitioner's other allegations against trial counsel, is based only on Petitioner's unsubstantiated assertions which are insufficient to demonstrate that trial counsel's performance was deficient or that Petitioner sustained prejudice as a result. *See Matura v. United States*, 875 F. Supp. at 237-38 (mere conclusory allegations that counsel was ineffective fail "to establish that his counsel's performance was deficient [and] . . . fail[ ] to overcome the presumption [under *Strickland*] that counsel acted reasonably. . . ."); *Hartley v. Senkowski*, No. CV-90-0395, 1992 WL 58766, at *2 (E.D.N.Y. Mar.18, 1992) ("In light of th[e] demanding [*Strickland* ] standard, petitioner's vague and conclusory allegations that counsel did not prepare for trial or object to errors carry very little weight.").

## 4.)     Failure to cross-examine a prosecution witness

Petitioner claims that counsel did not investigate benefits provided by the prosecutor to Tashawn Davis, the victim's girlfriend, in exchange for her testimony. Davis received about $400 from the district attorney's office to assist her with relocation expenses occasioned by her prior to trial. When made aware of this fact, trial counsel made the decision, which he placed on the record, that he did not think that this financial assistance was a *quid pro quo* with regard to her testimony and therefore did not cross-examine Davis about this issue. Petitioner speculates Davis may have received additional benefits, but, as respondent points out, he has not substantiated this assertion.

"The conduct of examination and cross examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *Eze v. Senkowski*, 321 F.3d 110, 127 (2d Cir. 2003) (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) (citing *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (no ineffective assistance despite defendant's claim that lawyer had failed to thoroughly impeach prosecution witnesses because decisions as to nature and extent of cross-examination are strategic); *United States v. Nersesian*, 824 F.2d at 1321 (stating that "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature" and generally will not support an ineffective assistance claim)). The Second Circuit has explained that although it is good practice for trial counsel to inquire into a witness's potential bias against the defense or motive for testifying, the failure to make such inquiries does not necessarily support a finding of prejudice under *Strickland*. *United States v. Luciano*, 158 F.3d at 660 (citing, *United States v. Nersesian*,

824 F.3d at 1321 (citing *United States v. O'Neil*, 118 F.3d 65, 73 (2d Cir. 1997) ("Likewise, Saia does not show prejudice from Farrell's failure to inquire on cross-examination into the extent to which each cooperating witness's sentence was to be reduced by cooperating with the government. Farrell did bring the witnesses' expectations of leniency to the attention of the jury and there is no reason to believe that further cross-examination would have had any more than a negligible effect on the jury's verdict.") (citing *Routly v. Singletary*, 33 F.3d 1279, 1289 (11ᵗʰCir.1994)), *cert. denied sub nom. Saia v. United States*, 522 U.S. 1064 (1998)). Such is the case here. There does not seem to have been a potential downside to cross-examining Davis about the relocation assistance she received but, at the same time, the Court cannot conclude that had counsel elicited that fact it would have undermined Davis' credibility to such an extent there is a reasonable probability the outcome of Montgomery's trial would have been different.

### 5.) Failure to investigate DNA evidence and retain an expert witness

Montgomery asserted in his second C.P.L. § 440.10 motion that his "case consist[ed] of DNA evidence" and trial counsel failed to investigate certain "crucial" evidence and to consult with a DNA expert. Petitioner's Affidavit in Support of Notice of Motion Seeking to Incorporate Previously Unexhausted Claim with Pending Writ of Habeas Corpus ("Pet'r Aff."), ¶¶20-24 (Docket No. 14).

Trial counsel cross-examined the prosecution's forensic witness who testified that there were 26 items of physical evidence collected; however, only 17 were examined and 9 were untested. Trial counsel cross-examined that witness regarding his decision not to analyze 9 items of evidence and his inability to find a DNA profile on five (5) other items. *See* T.410-12; C.P.L. § 440.10 Order dated June 4, 2004, at p.2. Trial counsel elicited testimony from the forensic

chemist that a hair recovered from in the victim's hand had characteristics consistent with a person of Caucasian descent. *See* T.231-32; *see also* C.P.L. § 440.10 Order dated July 19, 2005, at p.2.

According to Montgomery, trial counsel was remiss in not subjecting the items of physical evidence to DNA testing; he asserts that if counsel had done so, he would have discovered evidence exonerating Montgomery. He also focuses on the hair found in the victim's hand, which the forensics expert testified was of Caucasoid origin. Montgomery argues that this suggests that a Caucasian individual was the actual perpetrator, and that it proves that Montgomery was not the last person to see the victim alive. *See* Pet'r Aff., ¶21 (Docket No. 14). The C.P.L. § 440.10 court held that Montgomery's DNA claim was based solely on conjecture, noting that the untested items of physical evidence, including the hair, could have belonged to anyone, including the officials investigating the murder; it could have come from the trunk of the vehicle where the body was found, or even from the investigating police officers who handled the corpse. Thus, the state court concluded, Montgomery failed to show how he was prejudiced by counsel's failure to conduct DNA testing or retain a DNA expert. Furthermore, the state court held, trial counsel effectively cross-examined the prosecution's medical expert. *See* C.P.L. § 440.10 Order dated July 19, 2005, at pp. 2-3;

Contrary to Montgomery's contention, this was not the type of case where DNA was critical. *Cf. People v. Vasquez*, 12 Misc.3d 1163(A), 819 N.Y.S.2d 212 (Table), 2006 WL 1518817, at *2 (N.Y. Sup. Ct. June 2, 2006) ("There was no forensic evidence elicited at the trial linking defendant or his codefendants to the crime. The hair samples, not having been tested, were never scientifically connected to defendant or to anyone else. As a result, any DNA test

results would be immaterial to the issue of defendant's guilt and as such would not have an impact on the outcome of the trial. Because there was no scientific evidence used to obtain the conviction, the inclusion of another person and the exclusion of defendant as the donor, in this evidentiary context, makes it unlikely that there would have been a verdict more favorable to defendant if had a DNA test result identified some person other than the defendant. More importantly, there was no critical testimony that could be seriously impeached by the test result. *People v. De Oliviera, Jr.*, 223 A.D.2d 766 (3rd Dept.1996). Under these circumstances, it is improbable that the results of DNA testing on the hair samples would have any effect on the verdict.").  Accordingly, under the circumstances present here, I cannot conclude that the state court erred in concluding that trial counsel's failure to conduct DNA testing or retain a DNA expert negatively affected the outcome of Petitioner's trial.

**6.)      Failure to file a motion to vacate to set aside the verdict**

Montgomery has asserted for the first time in his papers filed after he moved to lift the stay that the "most questionable" of trial counsel's "fumbles" was his failure to file a motion to set aside the verdict under C.P.L. § 330.30. As respondent argues, this claim was not raised previously. A district court now has the discretion to deny a petition that contains both exhausted and unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2); *accord, e.g.*, *Pratt v. Greiner*, 306 F.3d 1190, 1197 (2d Cir. 2002). As respondent points out, the claim is entirely conclusory; Petitioner has suggested no possible bases on which trial counsel could have moved to set aside the verdict. This unmeritorious claim cannot form the basis for habeas relief under any standard of review and is denied.

**IV.      Conclusion**

For the reasons stated above, Russell Montgomery's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ Hon Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     July 30, 2010
           Rochester, New York